FOR PUBLICATION

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

JEFFREY CAMPBELL, JR.,        :    Hon. Joseph H. Rodriguez

           :
    Plaintiff,          :
           :    Civil Action No. 03-3159
    v.            :
           :
ABERCROMBIE & FITCH, CO.,     :    **OPINION**
           :
    Defendant.       :
           :

This matter has come before the Court on Defendant Abercrombie & Fitch, Co.'s ("A&F") Motion for Summary Judgment pursuant to Fed. R. Civ. P. 56(c) to dismiss Jeffrey Campbell's ("Campbell") claim that A&F violated the Civil Rights Act of 1871, 42 U.S.C. § 1981 ("§ 1981") and New Jersey's Conscientious Employee Protection Act, N.J. Stat. Ann. §§ 34:19-1, et seq. ("CEPA") when it fired Campbell in retaliation for Campbell's whistle-blowing activities.[1]  For the reasons expressed below, A&F's motion will be granted as to both claims.

## I.  FACTUAL BACKGROUND

All of the events giving rise to the adverse employment action occurred during the two and half months (April 6, 2003-June 24, 2003) that Campbell, an African-American, was employed as a Security Supervisor at A&F's Cherry Hill, New Jersey store. (Compl. ¶

---

[1] Campbell had also asserted a violation under the New Jersey Law Against Discrimination; however, Campbell has voluntarily withdrawn that claim.  (Opp. Br. at 1 n.1.)

5.)  Except where noted, the facts are undisputed and set forth below in chronological order.

After one month of employment, Campbell allegedly discovered that A&F "engaged in and had implemented illegal policies and practices with regard to recruiting, hiring, and maintaining a disproportionately Caucasian sales force." (Campbell Dep., Exh. A at 203-206.)[2]  In essence, Campbell alleges that Caucasians were placed in the higher paid "Brand Representative" positions, whereas minorities were categorically relegated to the lower-wage, stockroom positions.  (Opp. Br. at 2-4.)  The facts concerning these alleged practices play no part in the issue before the Court, and therefore, need not be elaborated on any further.

On May 12, 2003, Campbell made oral complaints of race discrimination to Chris Grindey ("Grindey"), an A&F Corporate Loss Prevention Manager, John Carriero (Carriero), Senior Manager of Security, and Corey Routh ("Routh"), Senior Director of Human Resources alleging that he had personally witnessed discrimination in the hiring of certain Brand Representative positions.  (Opp. Br. at 4-5.)  Campbell alleges that these complaints were met with "immediate hostility" and that he was threatened with the loss of his job by Carriero and Routh.  (Campbell Dep., Exh. A at 52, 62.)  Carriero and Routh dispute that these threats were made.  Campbell testified that he "was advised to cease

---

[2] Campbell took two depositions.  The first, taken April 20, 2004 is submitted by Campbell as Exhibit A.  The second deposition, dated February 4, 2005, is Exhibit D. Campbell's testimony will be referenced accordingly throughout the Opinion.

2

investigating the company's hiring practices because they 'don't practice discriminatory hiring practices." (Campbell Dep., Exh D. at 64-65.)  In response to these alleged threats, Campbell told Carriero and Routh that he had been in contact with the Equal Opportunity Commission ("EEOC").  (See Campbell Dep., Exh. A, at 83.)[3]

On May 13, 2003, Campbell committed these complaints to writing and sent the writing via fax to Routh.  (Campbell, Exh. E.)  Routh and Carriero again spoke to Campbell and Campbell testified that both Carriero and Routh took his concerns seriously, that they would conduct a full investigation, and that they were happy he had come forward with the information.  (Campbell Dep., Exh. A at 77-79.)  Routh testified that Campbell refused to give specific information about his allegations, and therefore, turned over the investigation to A&F Human Resources Representative, Eric Duerksen ("Duerksen") (Routh Dep. at 14-18.)  Duerksen states, without contradiction from Campbell, that A&F initiated an investigation based upon Campbell's claims and interviewed the Cherry Hill store manager.  (Duerksen Dep. at 9-15.)

On or about May 20, 2003, Duerksen interviewed Campbell about the alleged discriminatory employment practices.  (Campbell Dep., Exh. A, at 119-120.)  Campbell states that Duerksen allegedly treated him in a hostile manner.  (Id. at 123.)  Duerksen testified that he thanked Campbell for coming forward, yet Campbell refused to give any

---

[3]  Campbell did file a complaint with the EEOC on July 7, 2003, which is after his termination from A&F.  (See A&F Br., Exh. B.)  Once employment is terminated, an employee cannot suffer an adverse employment action.  See Glanzman v. Metropolitan Management Corp., 391 F.3d 506, 516 (3d Cir. 2004).

additional information.  (Duerksen Dep. at 16-18.)[4]  Thus, A&F proceeded in its

investigation without the assistance of Campbell.  No one, including Campbell, suggests

that he was involved in an A&F investigation concerning discriminatory hiring practices.

Carriero states that Campbell asked him if he could visit other stores, to which Carriero

told Campbell to concentrate on his security responsibilities at the Cherry Hill store.

(Carriero Dep. at 16-17.)  Further, Campbell, admits that the King of Prussia store was

outside his jurisdiction, see Campbell Dep., Exh. A at 164-166, and that he had no

authority to conduct human resources investigations, id. at 14.

Nevertheless, on June 23, 2003, while on a personal day, see Campbell Dep., Exh.

A, at 145, Campbell visited A&F's King of Prussia store in order to "uncover

discriminatory hiring practices."  (Campbell Dep., Exh. D at 63.)  Campbell testified that

he hoped to obtain "proof" of discrimination to support his claims.  (Exh. A, 159, 183.),

and provide footage for Fox News, see Exh. D at 15-16.  Campbell approached the store

manager and told him, "I do security supervisor [sic] for the company.  I do

investigations."  (Exh A., at 163.)

Campbell testified to showing the store manager an employee identification card,

and stated that he expected to replace the existing security supervisor in King of Prussia.

(Id. at 164.)  Campbell, however, had not officially assumed any duties at the King of

_____

[4]  Importantly, Campbell testified that A&F has corporate policies in effect that promote
people coming forward and supporting efforts to eradicate discrimination in the workplace.  (See
Campbell Dep., Exh. D, at 70.)

4

Prussia store.  (Id. at 166.)  Campbell stated that he "wanted to talk to a couple of the overnight workers."  (Id.)  Campbell did not disclose his actual reason for coming to the King of Prussia store to the store manager.  (Id.)  Instead, Campbell inferred that part of the reason he was paying a visit was because the King of Prussia store had a "shrink" [theft] problem.  (Id. at 167-168.)[5]

Campbell proceeded to the back stockroom by himself, questioned six or seven minority overnight stockroom workers, and made copies of the work schedules.  (Exh. A at 171-72, 179-80.)  Campbell looked through at least one personal jacket and determined the hourly wage of one stockroom employee.  (Id. at 174, 179.)  Campbell then proceeded back on the sales floor, approached some brand representatives, "showed them my badge so they would feel comfortable," and questioned these employees about their hourly wage. (Id. at 175.)  All told, Campbell estimates it was a 20 minute visit.  (Id.)

On June 23, 2003, Campbell and his attorney appeared on a Fox News broadcast in which Campbell stated his intention to file a civil lawsuit against A&F for discriminatory employment practices.  (Campbell Dep., Exh D. at 65-66.)  On June 24, 2003, Campbell was informed during a telephone conference with Routh, Carriero, and district manager Sarah Nicholson ("Nicholson") that he was terminated because he had misrepresented himself and conducted an unauthorized investigation at the King of Prussia store.

---

[5] However, at Campbell's second deposition he stated that he never represented that he was there on behalf of A&F, or that he was conducting an investigation of any kind.  (See Campbell Dep., Exh. D. at 62.)

(Campbell Dep., Exh. A. 192-93; Exh. D. at 68-69.)  No evidence has been proffered

indicating that the Fox News broadcast played any part in the decision to terminate

Campbell;  nor, can any inference be drawn that the corporate office in Columbus, Ohio

was aware of the broadcast that occurred in the Philadelphia area the night before.

## II.  DISCUSSION

### A.     Summary Judgment Standard

A court will enter a summary judgment only when "the pleadings, depositions,

answers to interrogatories, and admissions on file, together with the affidavits, if any,

show that there is no genuine issue as to any material fact and that the moving party is

entitled to a judgment as a matter of law."  Fed. R. Civ. P. 56(c).  An issue is "genuine" if

supported by evidence such that a reasonable jury could return a verdict in the non-moving

party's favor.  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).  A fact is

"material" if, under the governing substantive law, a dispute about the fact might affect the

outcome of the suit.  Id.  In determining whether a genuine issue of material fact exists, the

court must view the facts and all reasonable inferences drawn from those facts in the light

most favorable to the non-moving party.  Matsushita Elec. Indus. Co. v. Zenith Radio

Corp., 475 U.S. 574, 587 (1986).

Initially, the moving party has the burden of demonstrating the absence of a genuine

issue of material fact.  Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986).  Once the

moving party has met this burden, the non-moving party must identify, by affidavits or

otherwise, specific facts showing that there is a genuine issue for trial.  Id. at 324.  The

non-moving party may not rest upon the mere allegations or denials of its pleading.  Id.;

Maidenbaum v. Bally's Park Place, Inc., 870 F. Supp. 1254, 1258 (D.N.J. 1994).

> [T]he plain language of Rule 56(c) mandates the entry of summary
> judgment, after adequate time for discovery and upon motion, against a party
> who fails to make a showing sufficient to establish the existence of an
> element essential to that party's case, and on which that party will bear the
> burden of proof at trial.

Celotex, 477 U.S. at 322.

On a motion for summary judgment, the court does not "weigh the evidence and

determine the truth of the matter, but [instead] determine[s] whether there is a genuine

issue for trial."  Anderson, 477 U.S. at 242-43.  Credibility determinations are the province

of the factfinder.  Big Apple BMW, Inc. v. BMW of N. Am., Inc., 974 F.2d 1358, 1363

(3d Cir. 1992).

## B.    The Parties' Arguments

A&F contends that it did not fire Campbell in retaliation for complaints about

A&F's  alleged discriminatory hiring practices.  Rather, A&F asserts that it terminated

Campbell because he engaged in an unauthorized investigation at the King of Prussia store

on June 23, 2003.  Therefore, A&F urges this Court to dismiss Campbell's § 1981 and

CEPA claims because Campbell cannot demonstrate that his activities at the King of

Prussia store were "protected" under either statute.  Moreover, A&F asserts that

Campbell's previous complaints of discriminatory hiring practices, as well as the Fox

7

News broadcast, while likely protected, are nonetheless not causally related to Campbell's termination, which A&F argues is based upon legitimate, non-discriminatory reasons.  As such, A&F asserts that Campbell has failed to establish a *prima facie* case of retaliation.

Campbell does not specifically argue that his visit to the King of Prussia store was protected, but rather states that he previously engaged in protected activity when he opposed "a wide variety of [A&F's] practices."  (See Opp. Br. at 12.)  Campbell argues that the temporal proximity of his complaints of discrimination create a genuine issue of material fact that warrant denial of summary judgment.  (Id. at 14.)  Further, Campbell argues that it has set forth sufficient evidence for a reasonable jury to conclude that A&F's proffered reasons for terminating Campbell were pretextual.  (Id. at 16.)

## C.    Retaliation under § 1981

A claim of retaliation is examined using the familiar McDonnell Douglas burden shifting analysis.  Applying this analysis, if Campbell establishes a prima facie case of retaliation, the burden of production then shifts to A&F to "articulate some legitimate, nondiscriminatory reason for the employee's [termination]."  Fuentes v. Perskie, 32 F.3d 759, 763 (3d Cir. 1994) (citing  McDonnell Douglas Corp. v. Green, 411 U.S. 792, 802 (1973)).  If A&F rebuts Campbell's *prima facie* case in this manner, however, the burden shifts back to the Campbell to demonstrate that A&F's proffered reasons for terminating him were pretextual.  Nevertheless, it is important to note that although "the burden of production may shift" during the McDonnell Douglas inquiry, the "'ultimate burden of

8

persuading the trier of fact that the [employer] [retaliated] against the [employee] remains at all times with the [employee].'" Williams v. Phila. Hous. Auth. Police Dep't, 380 F.3d 751, 759 n.3 (3d Cir. 2004) (quoting Tex. Dep't of Cmty. Affairs v. Burdine, 450 U.S. 248, 253 (1981)).

The Third Circuit applies the same three-part test under § 1981, Title VII, and the NJ LAD when establishing a *prima facie* case of retaliation: (1) that plaintiff engaged in a protected activity; (2) that plaintiff suffered an adverse employment action; and (3) that there was a causal connection between the protected activity and the adverse employment action. Cardenas v. Massey, 269 F.3d 251 (3d Cir. 2001). It is undisputed that Campbell's termination constitutes an adverse employment action; therefore, only the sufficiency of the first and third prongs will be discussed.[6]

Recently, the Third Circuit declared "that here is no hard-and-fast rule covering what a plaintiff must show in order to establish the McDonnell Douglas prima facie showing." Fasold v. Justice, — F.3d —, 2005 U.S. App. LEXIS 10012, at *15 n.10 (3d Cir. June 1, 2005). Rather, "the precise elements of a plaintiff's prima facie case may vary with the particular circumstances." Id. (citations and quotations omitted); see also Geraci v. Moody-Tottrup Int'l, Inc., 82 F.3d 578, 581 (3d Cir. 1996) ("The elements of the prima facie case . . . must not be applied woodenly, but must rather be tailored flexibly to fit the

---

[6] A&F does not dispute that it effected an adverse employment action against Campbell by terminating Campbell. Accordingly, the court finds that Campbell has satisfied the second element of his *prima facie* case. See Hartsell v. Duplex Prods., Inc., 123 F.3d 766, 775 (4th Cir. 1997) (noting that termination is an adverse employment action).

circumstances of each type of illegal discrimination.").

1.      **Protected Activity**

In borrowing the Title VII framework, courts have recognized two distinct acts of protected activity under a theory of unlawful retaliation: opposition activity and participation activity.  The opposition clause prohibits retaliation because the employee "opposed any practice made an unlawful employment practice by [Title VII.]"  Robinson v. Southeastern Pa. Transp. Auth., 982 F.2d 892, 896 n.4 (3d Cir. 1993) (citations omitted).  Whereas, the "participation clause" prohibits retaliation because the employee "made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under [Title VII.]"  Id.

Campbell characterizes his activities as opposition activities, which is accurate since he was not part of any investigation.  The opposition/participation distinction is crucial because "means of opposition have been narrowly construed" to limit protection in circumstances when the employee's protests interfere with job performance.  Id. (citing Booker v. Brown & Williamson Tobacco Co., 879 F.2d 1304, 1312-13 (6th Cir. 1989)).

The complicating feature of Campbell's case is that the record shows multiple forms of opposition conduct, that are compressed in a two and a half month employment period.  Early in his Brief, Campbell limits his activities to "having registered complaints of employment discrimination with [A&F's] management team."  (Opp. Br. at 2.)  Later, Campbell states that on May 12, 2003, he "registered internal complaints of discrimination

10

with Grindey, Carriero, and Routh that led [A&F] to conduct an internal investigation into its hiring practices."(Id. at 2.)  Further, on May 13, 2003 Campbell faxed a written [formal] complaint to Routh, and that Campbell threatened to file a charge of discrimination with the EEOC.  Tentatively, and without strenuous objection by A&F, these activities would likely be deemed protected activities.

In addition, there is the matter of the Fox News broadcast, which aired in the Philadelphia area on or about June 23, 2003; the same night Campbell visited the King of Prussia store.  During this previously taped interview, Campbell appeared with other minorities and accused A&F of discriminatory hiring practices.  (Compl. ¶ 19.)  Despite its temporal proximity to his June 24th termination, there is no indication that Routh or Carriero, who reside in Columbus, Ohio, were aware of the broadcast when they made the decision to terminate Campbell.  (See Carriero Dep. at 21; Routh Dep. at 11.)  In addition, no evidence has been submitted indicating that someone told them of the broadcast.  Because there exists no proof that A&F knew of this incident, it plays no part in the analysis of the retaliatory discharge claim.  Thus, it is not necessary to address A&F's argument that such "grossly inappropriate behavior" does not insulate Campbell from disciplinary action.  (See Opp. Br. at 13 n.6.)  As previously discussed, filing of an EEOC complaint would be relevant had the complaint been filed before Campbell's termination. See, supra, note 3.

Therefore, A&F contends that the unitary act that resulted in Campbell's

11

termination was his unauthorized visit to the King of Prussia store on June 23, 2003, in which A&F alleges that Campbell "lied repeatedly to store management and personnel, fraudulently misrepresented himself in order to gain access to confidential employee documents, stole company property, conducted unauthorized employee interviews regarding wage rates, and severely abused his position as a Security Supervisor at Abercrombie." (Mot. at 3.) This is the only reason proffered by A&F, and the testimony of Campbell does not refute this; hence, the critical issue is whether this opposition activity is protected. If it is not protected activity, the next step in the analysis is to determine whether it served as a legitimate, intervening cause of termination despite the existence of earlier protected activity, thereby creating a genuine issue of material fact as to A&F's proffered justification.

The Third Circuit has not spoken as to what opposition activities are protected in a retaliation claim; however, the issue has received considerable attention by other Circuit Courts. To qualify for protection as an opposition activity, an employee's behavior need not rise to the level of filing a formal charge of discrimination against his employer. Armstrong v. Index Journal Co., 647 F.2d 441, 448 (4th Cir. 1981). Protected activity under the opposition clause includes "utilizing informal grievance procedures as well as staging informal protests and voicing one's opinions in order to bring attention to an employer's discriminatory activities." Laughlin v. Metro. Washington Airports Auth., 149 F.3d 253, 259 (4th Cir. 1998) (citing Armstrong, 647 F.2d at 448). To determine whether

12

an employee has engaged in legitimate opposition activity, courts traditionally "'balance the purpose of [Title VII] to protect persons engaging *reasonably* in activities opposing . . . discrimination, against Congress' equally manifest desire not to tie the hands of employers in the objective selection and control of personnel.'" Armstrong, 647 F.2d at 448 (quoting Hochstadt v. Worcester Found. for Experimental Biology, 545 F.2d 222, 231 (1st Cir. 1976)).

In applying this balancing test, this Court's approach is consistent with every other Circuit Court of Appeal that has addressed this issue.[7] Thus, the Third Circuit would likely find this majority position persuasive. If, under this balancing test, the manner in which the employee complains or acts is found to be unreasonable, it is unprotected; the employee's conduct then may be deemed an independent, legitimate basis for the adverse employment action.

Not surprisingly, several courts have determined that unauthorized investigations that are contrary to company policy are unreasonable activities, and therefore, unprotected. An example of this occurred in Laughlin v. Metropolitan Washington Airports Auth., 149 F.3d 253 (4th Cir. 1998), when the Metropolitan Airports Authority ("Metro") discharged Laughlin after Laughlin admitted during a deposition that she had taken confidential

---

[7] See Matima v. Celli, 228 F.3d 68 (2d Cir. 2000); Robbins v. Jefferson County Sch. Dist., 186 F.3d 1253 (10th Cir. 1998); O'Day v.McDonnell Douglas Helicopter Company, 79 F.3d 756, 763 (9th Cir. 1996); Rollins v. State of Florida Dept. of Law Enforcement, 868 F.2d 397, 401 (11th Cir. 1989); Jones v. Flagship Int'l, 793 F.2d 714, 728 (5th Cir.1986), cert. denied, 479 U.S. 1065 (1987); Pendleton v. Rumsfeld, 628 F.2d 102, 108 (D.C. Cir.1980); Hochstadt v. Worcester Foundation for Experimental Biology, 545 F.2d 222, 231 (1st Cir. 1976).

personnel documents from her supervisor's desk and provided those documents to a former employee who later filed an employment discrimination suit against the Metro.  Laughlin, 149 F.3d at 256-57.  The Laughlin court concluded that Metro's interest in maintaining the security and confidentiality of sensitive personnel documents outweighed Laughlin's interest in providing those documents to the former employee to assist that employee in opposing allegedly discriminatory practices, and therefore Laughlin's action was not protected activity under the opposition clause of Title VII.  Id. at 260.[8]

Similarly, despite drawing all favorable inferences in Campbell's favor, Campbell's conduct on June 23, 2003 was unreasonable.  The overwhelming weight of the evidence indicates that Campbell made complaints of discrimination, and without contradiction, were acted upon by A&F management.  Campbell's testimony supports his unwillingness to support the A&F-sponsored investigation, which in and of itself is a violation of company policy.  (See Campbell Dep., Exh. A. at 70-71.)  Campbell, instead asked Carriero to visit other stores so that he could conduct his own investigation; Carriero denied this request.

---

[8]  Besides Laughlin, A&F cites to two other cases which are squarely on point.  O'Day, 79 F.3d at 763 (finding the employee was not protected under the retaliation provisions of the ADEA, when he rummaged through his supervisor's office for confidential documents, copied those documents and showed them to a co-worker);  Jefferies v. Harris County Community Action Ass'n, 615 F.2d 1025, 1036 (5th Cir. 1980) (surreptitiously copying and disseminating personnel records is not protected under Title VII); see also Matima, 228 F.3d at 81 (claimant's conduct was unreasonable when he repeatedly confronted and antagonized his supervisors in inappropriate contexts in a way that was designed to "force the company's hand or make it pay a price in reduced productivity, focus and morale.")

Thus, on a "personal day" Campbell appeared at the King of Prussia store with a non-employee friend who brought a video camera. Campbell entered the store, approached the store's manager, insinuated that he was there on some sort of official capacity, brandished an identification card, and then proceeded, unescorted, to stockroom areas of the store and conducted unauthorized interviews to employees who were on the clock, inspected personnel files, and/or copied employment records. It is uncontroverted that Campbell's job did not allow him access to the storeroom area of the King of Prussia store, or permit him to do any of the activities at the store.

A&F's interest in maintaining the morale and discipline of its workforce and confidentiality of sensitive personnel documents outweighed Campbell's interest in providing any additional information to A&F, who was already conducting an investigation. Additionally, given these facts, it does not appear that the employees' interest, in opposing allegedly discriminatory practices, would be jeopardized because the employer was acting on and investigating Campbell's allegations. Nothing in the record suggests that A&F was not responsive to Campbell's claims. The testimony of Duerksen and Carriero, as well as Campbell himself, state that Campbell refused to cooperate and provide the details of his complaints. It is patently unreasonable for an employee to levy complaints of discrimination, refuse to cooperate once the employer has begun an investigation, and then take things into their own hands and proceed in their own investigatory activities which are in contravention to company policy. Consequently,

Campbell's actions on June 23, 2003 were not protected activity, and therefore, Campbell has failed to establish a *prima facie* case of retaliation.

### 2. Causal Connection

Campbell has also failed to satisfy the causal connection prong of his *prima facie* case. Cases considering the "causal link" prong begin with the temporal proximity between the employee's protected activity and the adverse employment action. This is so, because the Third Circuit has stated that it is an obvious method by which a plaintiff can proffer circumstantial evidence sufficient to raise the inference that her protected activity was the likely reason for the adverse action. Kachmar v. Sungard Data Sys., 109 F.3d 173, 177 (3d Cir. 1997); Jalil v. Avdel Corp., 873 F.2d 701, 708 (3d Cir. 1989) (determining that the causation element was satisfied by showing that the plaintiff's discharge occurred only two days after his protected activity). These are not the exclusive ways to show causation, as the proffered evidence, looked at as a whole, may suffice to raise the inference. See, e.g., Waddell v. Small Tube Products, Inc., 799 F.2d 69, 73 (3d Cir. 1986). It should be noted, however, that temporal proximity is neither necessary nor sufficient to establish causation. The Kachmar court explained:

> It is important to emphasize that it is causation, not temporal proximity itself, that is an element of plaintiff's prima facie case, and temporal proximity merely provides an evidentiary basis from which an inference can be drawn. The element of causation, which necessarily involves an inquiry into the motives of an employer, is highly context-specific. When there may be valid reasons why the adverse employment action was not taken immediately, the absence of immediacy between the cause and effect does not disprove causation.

16

Kachmar, 109 F.3d at 178.

Additional factors to consider include whether there is evidence of antagonism or retaliatory animus during the intervening period, Krouse v. Am. Sterilizer Co., 126 F.3d 494, 503 (3d Cir. 1997), or whether there are other "types of circumstantial evidence" to support a causal connection Farrell v. Planters Lifesavers Co., 206 F.3d 271, 280-81 (3d Cir. 2000). Ultimately, there are "no limits" on what a court can consider in determining whether a causal connection exists between an employee's protected activity and his employer's adverse decision. Farrell, 206 F.3d at 281; Kachmar, 109 F.3d at 177 (stating that "the proffered evidence, looked at as a whole, may suffice to raise the inference").

The Supreme Court has recognized that the *prima facie* element of causation and the element of causation in the subsequent ultimate proof stage of the case [McDonnell Douglas burden shifting paradigm] are often factually insperable and therefore a court may rely on evidence provided in the earlier stage in resolving the latter. Reeves v. Sanderson Plumbing Prods., Inc., 530 U.S. 133, 147 (2000). Thus, a plaintiff's circumstantial evidence of retaliation may include evidence that "demonstrate[s] such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable factfinder could rationally find them unworthy of credence, and hence infer that the employer did not act for [the asserted] non-[retaliatory] reasons." Fuentes, 32 F.3d at 765. Also, Campbell may proceed under either one of two theories of causation: (1) a "mixed motive" theory, or (2) a "pretext"

17

theory.  Schlichtig v. Inacom Corp., 271 F. Supp. 2d 597, 611 (D.N.J. 2003)  Here,

Campbell only asserts a pretext theory; whereby an employee may present circumstantial

or indirect proof that his protected conduct was the motivation for his termination.[9]

Recently, one district court held that the causal link can be severed if the employer

establishes an intervening and legitimate cause for the adverse employment action despite

the fact that the employee engaged protected activities before hand.  Tasadfoy v. Ruggiero,

365 F. Supp. 2d 542, 2005 WL 894703 (S.D.N.Y. 2005).  The court stated that "on this

record, a reasonable fact-finder would have to conclude that substantial events intervened

between any instances of protected speech and the allegedly retaliatory activity."  Id. at

551.  In Tasadfoy, three of the four specific charges preferred against plaintiff grew out of

(1) an admitted violation of the law and (2) actions relating to the obliteration of

documents from co-workers' computers.  Id.  The court held that the events that

precipitated the charges are "paradigmatic examples of intervening acts that are so

obviously the proximate cause of the adverse employment action that they cancel out any

inference of causation."  Id.

---

[9]  Another method of proving the causal link is through the "mixed motive" theory.
Under this theory, an employee must present direct evidence that an adverse employment action
was taken against him because of his whistle-blowing activity.  See Schlichtig, 271 F. Supp. 2d
at 610 (citation omitted).  The evidence is direct if it is "so revealing of [retaliatory] animus that
it is unnecessary to rely on any presumption from the prima facie case to shift the burden of
production to the employer."  Id. (quotation and citation omitted).  The mixed motive theory is
inapplicable in this case because Campbell has not presented any direct evidence that A&F
"placed substantial negative reliance on [his statutorily protected conduct] in reaching [its]
decision" to terminate him.  Id. (quotation and citation omitted).

Even assuming Campbell engaged in earlier protected activities, Campbell nonetheless fails to establish a *prima facie* case of retaliation because there exists no causal relation between these activities and his termination as a matter of law.  There is no basis in the record for inferring that Campbell's termination was in any way linked to his previous complaints to either Carriero, Routh, Grindey, or Duerksen.  In fact, there is evidence supporting a contrary inference because Campbell testified on what A&F's articulated reasons for terminating him were: namely, his unauthorized visit to the King of Prussia store.  But, while Campbell's termination came only six weeks after he complained of the discriminatory hiring practices, this situation alone does not, looking at the totality of the circumstances, establish a reasonable inference of causation.  Kachmar tells us that temporal proximity alone is not enough.  Causation is not established here not only because Campbell's argument conveniently omits that Campbell's discharge followed even more closely on the heels of his unauthorized investigation of the King of Prussia store (which itself came closely on the heels of explicit warning from Carriero not to visit other stores, see Carriero Dep. Exh. A. at 193, Exh. D. at 16-17), but it also ignores the troublesome fact that Campbell failed to cooperate in the very investigation that was initiated by his own allegations.  Indeed, anti-retaliation laws do not provide employees "a license to flaunt company rules or an invitation to dishonest behavior."  O'Day, 79 F.3d at 764.

Furthermore, Campbell's rebuttals to the June 23rd incident are unsupported by the

record.  Campbell's testimony indicates that he was off-duty, located in a store that was not under his jurisdiction, in which he was expressly told by his manager not to visit (thereby alerting Campbell that such conduct would not be tolerated), he approached the store manager and brandished an identification card, proceeded un-escorted to the rear area of the store where he admits to viewing at least one confidential personnel file and interviewing employees who were on the clock.  These facts speak for themselves, and Campbell's attempts to raise genuine issues of material fact based on his deposition testimony are not convincing.[10]  Additionally, Campbell labels Carriero's statement that one of the managers at the King of Prussia store reported the following morning that Campbell visited the store on June 23d "nothing more than a fabrication."  Yet, Campbell unequivocally testifies that Routh and Carriero explained to him that the reason for his termination was the unauthorized visit.  If Routh and Carriero had learned about the unauthorized investigation after the fact, they would have told Campbell that there was some other reason for his termination.  Moreover, Campbell contends that there exists no evidence that anyone from the home office in Columbus, Ohio knew of his visit.  Yet, it is undisputed that they knew about his visit since Campbell tells us they did.  (See A&F Reply at 12 n.7.)  Thus, Carriero's statement that one of the King of Prussia managers called the home office to report Campbell's visit is not only plausible, but also likely given

---

[10]  For example, Campbell states that **at no time** during his visit to the King of Prussia store did he represent that he was acting on behalf of A&F or that he was there conducting an investigation.  (See Opp. Br. at 18) (emphasis supplied).  This claim is not supported by a liberal reading of Campbell's testimony.  (See Campbell Dep., Exh. A, at 163-168.)

20

the very short time that it took for the information to reach the home office in Columbus, Ohio.

Finally, Campbell's attempt to characterize A&F's proffered reasons for termination as inconsistent or contradictory is without merit.  Campbell states that the sole reason presented to Campbell for his termination was that he misrepresented himself to King of Prussia management, and that A&F later changed its story to include charges of stealing property, abusing his position as security supervisor, and interviewing employees while they were on company time.  Campbell testified that at the June 24th teleconference he was informed that he conducted an "unauthorized investigation and you disobeyed a direct order when I [Carriero] told you not to do an investigation."  (Campbell Dep., Exh A. at 193.)  There is no indication that A&F has wavered from their stated reason for the termination because Campbell's testimony concurs with that of Carriero and Routh (see Carriero Dep. at 23-24; Routh Dep. at 23) in that the grounds for discharge were based on the totality of Campbell's activities at the King of Prussia store on June 23, 2003.

Therefore, Campbell's argument does not raise "such weakness, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable factfinder could rationally find them unworthy of credence."  Fuentes, 32 F.3d at 765.  It would be another matter if A&F conferred a different reason for his discharge, and now tried to proffer a post-hoc basis for Campbell's discharge.  That did not happen here.  Campbell's unauthorized investigation, in any

21

favorable light, gave A&F ample justification to terminate him.  As such, there is no basis

to from which to draw a reasonable inference that A&F's proffered reasons are

pretextual.[11]

## D.    New Jersey's Conscientious Employee Protection Act

The New Jersey Legislature enacted the Conscientious Employee Protection Act to

"protect and encourage employees to report illegal or unethical workplace activities and to

discourage public and private sector employers from engaging in such conduct."  Dzwonar

v. McDevitt, 828 A.2d 893, 900 (N.J. 2003) (internal citation and quotation omitted).  A

CEPA plaintiff must prove four elements:

(1) he or she reasonably believed that his or her employer's conduct was
violating either a law, rule, or regulation promulgated pursuant to law, or a
clear mandate of public policy;
(2) he or she performed a "whistle-blowing" activity . . .;
(3) an adverse employment action was taken against him or her; and
(4) a causal connection exists between the whistle-blowing activity and the

---

[11]  Recently, the Third Circuit affirmed this very Court's grant of summary judgment in a non-precedential, CEPA case where the employer had an unquestioned and legitimate, non-discriminatory reason for the employee's termination.  See Zaffuto v. Wal-Mart Stores, Inc., 2005 U.S. App. LEXIS 8279 (3d Cir.  May 11, 2005) (finding that the employee borrowed money from his subordinates in order to pay his corporate credit card bill and falsely reported a New Jersey residence in order to obtain a higher cost-of-living adjustment to his salary).  Thus, Fasold v. Justice, — F.3d —, 2005 U.S. App. LEXIS 10012 (3d Cir. June 1, 2005), while precedential, is distinguishable because in that ADEA retaliation case, there was no intervening, and legitimate reason for the employee's discharge that severed the causal link between the protected activity and the adverse employment action.  Instead, in Fasold, there was evidence that the employer was "irritated" with the employee's protected activity; and that, was sufficient to support an inference by the trier of fact that a causal link was established.  Id. at *31-32.  Also dissimilar, is the fact that the employer in Fasold articulated four reasons for the employee's discharge; yet, these reasons suffered from factual inconsistencies and weaknesses that are not present in this case.  Finally, Fasold does not control here because it is not a whistle-blower case, therefore, the reasonableness analysis concerning the employee's conduct is not in play.

adverse employment action.

Dzwonar, 828 A.2d at 900.

In circumstantial evidence cases, New Jersey courts apply the burden shifting framework of McDonnell Douglas and its progeny.  Fleming v. Corr. Healthcare Solutions, Inc., 751 A.2d 1035, 1041 (N.J. 2000).  Furthermore, New Jersey has adopted the identical analysis as its federal counterpart under § 1981 or Title VII regarding the causation element of a retaliatory discharge claim.  As recognized by the New Jersey courts, the prima facie element of causation and the element of causation in the subsequent ultimate proof stage of the case are often factually inseparable and therefore a court may rely on evidence provided in the earlier phase in resolving the latter.  Donofry v. Autotote Sys., Inc., 795 A.2d 260, 270 (N.J. Super. Ct. App. Div. 2001) (citing Reeves v. Sanderson Plumbing Prods., Inc., 530 U.S. 133, 147, 147 L. Ed. 2d 105, 120 S. Ct. 2097 (2000)).

For the same reasons that Campbell's conduct on June 23, 2003 was unreasonable and an intervening, and legitimate cause for his termination under § 1981, it is likewise established that there exists no genuine issues of material facts as it relates to Campbell's claims under CEPA.  Neither party suggests any higher level of analysis garnered under CEPA, nor has research uncovered a different standard.  See Bowles v. City of Camden, 993 F. Supp. 255, 261 (D.N.J. 1998) (holding that the basic elements of a CEPA retaliatory discharge claim are similar to those required to make out an actionable violation of Title VII's anti-retaliation provisions).  Therefore, A&F is also entitled to summary

23

judgment as a matter of law as to Campbell's retaliation claim under CEPA.

### III.  CONCLUSION

Even though Campbell disputes the validity of the reason for his termination, he has not pointed to sufficient evidence to support an inference that A&F did not act on its proffered, legitimate non-retaliatory reason.  Campbell's June 23, 2003 visit to A&F's King of Prussia store, was unauthorized, unreasonable under the law, and therefore, not protected activity.  Viewing the evidence in the light most favorable to Campbell, he has not demonstrated a prima facie case of retaliation under § 1981 or CEPA since Campbell has failed to establish a causal connection between his alleged whistle-blowing activities and his termination, and, thus, has not met his burden of proof as to the causation element of his retaliation claim.  Accordingly, summary judgment must be granted in favor of A&F.  An appropriate order will be entered.


DATE: June 9, 2005

                          _____ /S/ Joseph H. Rodriguez___
                                              JOSEPH H. RODRIGUEZ
                                              U.S.D.J.

24